(91 Misc. Rep. 631)

DAVIS v. EPOCH PRODUCING CORPORATION et al.

(Supreme Court, Special Term, New York County.   September, 1915.)

1. SPECIFIC PERFORMANCE ⬡⟶28—CONTRACTS—RIGHT TO REMEDY.
      If it is doubtful whether a contract has been made, or its terms are ambiguous, specific performance will be denied.

      [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 61–68; Dec. Dig. ⬡⟶28.]

2. INJUNCTION ⬡⟶137—INJUNCTION PENDENTE LITE—SPECIFIC PERFORMANCE —MUTUALITY OF REMEDY—MOTION PICTURE RIGHTS.
      Where, on motion for an injunction pendente lite in a suit to compel specific performance of a contract for certain motion picture rights in a film, telegrams exchanged between the parties show that the terms of the contract had not been agreed upon, and it appears that prior to commencement of the action there was no discussion of matters vital to both parties, and that plaintiff has not bound himself to any of the stipulations usual in such contracts, the motion will be denied.

      [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 307–309; Dec. Dig. ⬡⟶137.]

---

⬡⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. SPECIFIC PERFORMANCE ☜13—RIGHT TO REMEDY—IMPOSSIBILITY OF PER-
   FORMANCE.
       Specific performance of a contract for certain motion picture rights in
   a film will be denied, where it appears that defendant has disposed of a
   material part of the rights, and therefore will be unable to comply with a
   decree against him.
       [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§
   30–32; Dec. Dig. ☜13.]
4. INJUNCTION ☜137—MOTION FOR INJUNCTION PENDENTE LITE—SPECIFIC
   PERFORMANCE.
       A motion for an injunction pendente lite in an action to compel specific
   performance of a contract for certain motion picture rights will be de-
   nied, where it appears that an injunction would be tantamount to a de-
   cree for specific performance, and that defendant would be unable to
   specifically perform.
       [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 307–309;
   Dec. Dig. ☜137.]

Action by George H. Davis against the Epoch Producing Corporation
and others, for the specific performance of an alleged contract where-
in plaintiff moves to have injunction continued pendente lite. Motion
denied, and temporary injunction dissolved.

Feiner & Maass, of New York City, for plaintiff.
Seligsberg & Lewis, of New York City, for defendants.

SHEARN, J.  Plaintiff sues for the specific performance of an al-
leged contract for certain motion picture rights, and has obtained an
order restraining the defendants from disposing of the exhibition or
producing rights to the film known as "The Birth of a Nation" in 17
states.  This is a motion to have the injunction continued pendente
lite, which would, in effect, amount to compelling the specific perform-
ance sought in the final judgment.  Plaintiff is a theatrical manager
residing at San Francisco, Cal.  He there met David W. Griffith, vice
president of the defendant Epoch Producing Corporation, on June 24,
1915, and, to use his own language—

"discussed with him the purchase of the exhibition rights of the said film
(The Birth of a Nation).  We discussed the territory in which I desired to
secure such exhibition rights, the price that I was to pay therefor, and the
number of prints of said moving picture film which I was to receive as an
incident to said contract, and as to the means of exercising such exhibi-
tion rights."

As a result of the discussion, Griffith sent two telegrams, which
are substantially the same, one to H. E. Aitken, president of the defend-
ant corporation, the other to the treasurer.  Plaintiff bases his claim
upon these telegrams, which are as follows:

                                                          "June 24, 1915.

"H. E. Aitken, Masonic Temple Building, 23d & Sixth Ave., New York,
N. Y.:  George H. Davis, an associate of Belasco at Alcazar Theater, offers
ninety thousand dollars for the states of Oregon, Nevada, Arizona, Utah,
Idaho, Montana, Washington, Wyoming, Colorado, New Mexico, Kansas, Ne-
braska, Iowa, North Dakota, South Dakota, Minnesota.  This includes
Washington after the present engagement of eight weeks, for which you
have already received payment, are through.  This also includes ten prints
of the picture.  Twenty thousand dollars upon signing the contracts, balance

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

within thirty days. Davis is experienced and capable man. If these terms are acceptable, he will come to New York immediately to make final arrangements. This is outright sale, and company has no share in profits. If Brennan has not closed, wire me answer Alexandra Hotel Los Angeles.

"D. W. Griffith."

"June 25, 1915.

"George H. Davis, Alcazar Theater, San Francisco, Calif.: Offer to Griffith accepted for Oregon, Nevada, Arizona, Utah, Idaho, North Dakota, South Dakota, Minnesota, Iowa, Montana, Washington, Wyoming, Colorado, New Mexico, Kansas, Nebraska, excluding eight weeks' present engagement in Washington; includes ten prints, terms twenty thousand cash, seventy thousand thirty days. Wire when you expect to arrive in New York.

"Epoch Producing Corporation.

"Longacre Building."

Plaintiff telegraphed, in reply:

"June 25, 1915.

"Will leave next Wednesday for New York, bringing required cash with me. Will require four or five days at theater here to arrange matters so I can remain away length of time needed to consummate deal. Will see you immediately upon arrival. Geo. H. Davis."

When plaintiff arrived in New York he found that the defendant corporation had, regardless of its acceptance of his offer, disposed of the purchasing rights of the film for the city of Portland, Or. Plaintiff was willing and anxious, nevertheless, to obtain a contract for the balance of the territory covered by the telegrams, but demanded an abatement in price because Portland was excluded. Although the defendant corporation had secured $8,000 for Portland, it flatly refused to abate the price. Plaintiff tendered his cash payment of $20,000, which was refused, and then commenced this action.

[1] That plaintiff has been unfairly dealt with and that the equities are strongly in his favor is beyond doubt, and, if the law permitted, an injunction should issue. The matter must be determined, however, upon settled legal principles, in which sympathy for the party unfairly dealt with and reprobation for the course pursued by the defendant corporation have no part. In order to justify requiring specific performance of a contract, there must be no doubt as to the existence of the contract; it must have been concluded, and not in the process of negotiation, and none of the terms must be left to be settled by future negotiations. If it is doubtful whether an agreement has been concluded, specific performance will not be granted. Mayer v. McCreery, 119 N. Y. 434, 23 N. E. 1045; Brown v. N. Y. C. R. R. Co., 44 N. Y. 79; Petze v. Morse Dry Dock & Repair Co., 125 App. Div. 267, 109 N. Y. Supp. 328, affirmed without opinion 195 N. Y. 584, 89 N. E. 1110. Neither will a court of equity specifically enforce a contract unless its terms, covenants, and conditions are obviously complete, certain, well-defined, and unambiguous. Racich Asbestos Mfg. Co. v. Brooks, 146 App. Div. 14, 130 N. Y. Supp. 382; Dalzell v. Dueber Watch Case Mfg. Co., 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749; Buckmaster v. Thompson, 36 N. Y. 558; Stanton v. Miller, 58 N. Y. 192; Shakespeare v. Markham, 72 N. Y. 400.

[2] Moreover, an injunction which finally decides the litigation will not be granted where the right thereto is doubtful, and should only

be granted on the clearest evidence and with the greatest caution. If the telegrams exchanged constitute a contract, there is no doubt of the correctness of plaintiff's position that it was none the less obligatory upon both parties, although they intended that it should be put into another form, which, when reduced to a formal written contract, should be subsequently executed. Sanders v. Pottlitzer Bros. Fruit Co., 144 N. Y. 209, 39 N. E. 75, 29 L. R. A. 431, 43 Am. St. Rep. 757; Pratt v. H. R. R. Co., 21 N. Y. 308; Ferguson Cont. Co. v. Helderberg Cement Co., 135 App. Div. 494, 120 N. Y. Supp. 317. The telegrams exchanged show that the parties had not finally agreed upon the terms of a contract. In his telegram of June 25, 1915, plaintiff says:

"Will require four or five days at theater here to arrange matters so I can remain away length of time needed to consummate deal."

In the telegram dated June 24, 1915, that Griffith sent at plaintiff's request, it was said:

"If these terms are acceptable, he will come to New York immediately to make final arrangements."

What was it that made it necessary for the plaintiff to come all the way across the continent, if the telegrams constituted a contract? Certainly not to make the first payment, for a certified check sent by mail would have answered this purpose. Not to obtain the prints, for they were not ready, and, when ready, could be sent by express. The real reason is to be found in plaintiff's own telegram, namely, that he was coming to New York and going to remain the "length of time needed to consummate deal."

A court cannot specifically enforce an unconsummated deal. This is not a case of buying horses, or grain, or securities, where all that is necessary is to agree on price, quantity, and delivery. The subject of this negotiation was not even stated in the telegrams, but it is conceded that it consisted of the "rights" to the motion picture film "The Birth of a Nation" for the states specified. What are these "rights"? The telegrams do not show, neither do the moving papers. There is no well-defined meaning attached to the words "producing rights," or "state rights," of a motion picture, that a court can take notice of. On the other hand, the defendant's affidavits show that there are three ways of marketing a motion picture of this character: (1) The negative can be sold to some corporation, which will in turn arrange for the marketing of the film; or (2) the owner of the negative can directly arrange for the exhibition of the pictures in theaters; or (3) the exhibition of the picture can be procured by the sale of territorial rights—that is to say, of the right to exhibit the picture in certain specified territory. It is further shown that "state rights" may merely permit the exhibition by the person acquiring the same of the picture in a particular territory, or they may generally authorize the person acquiring the same to deal with the picture as owner. It is further shown that there is no accepted form of contract for the acquisition or granting of "state rights," and that there are no terms which are identical in all such contracts; that every such contract faces

a different situation from any other, because of differences in local regulations, and because of the different character of the territory served. The greatest damage, it is averred, can be done to the owner of the negative of a photo play by what is known in the trade as "duping"; that is, making positive prints thereof from a positive print, instead of from the original negative. In such case the owner of the negative gets nothing of value for such copies, and they travel into various territories and interfere with his sale of territorial rights, or with persons who have purchased territorial rights. It is shown that some persons who dispose of territorial rights insist upon a surety company bond being given in order to insure the proper performance of the purchaser's obligations, and in some contracts for territorial rights there are stringent provisions against subletting or assignment. It is further alleged that "The Birth of a Nation" is unique, not only because of its quality, but because of the method in which it has been presented to the public; that special music has been written for it, and that the owner feels that a large part of the value of the photoplay in the future will be lost if it is improperly presented. For this reason it is alleged that in any contract for territorial rights of this photoplay it is necessary to make provision with reference to the presentation, the use of the musical accompaniment, the size of the orchestra, the methods of advertising, the character of the theaters in which the photoplay is to be presented, and also to regulate the minimum prices at which such presentation is to be permitted.

Prior to the institution of this suit it is shown, without contradiction, none of these matters had been discussed between the parties, matters which were vital to both parties, and which doubtless afford a true explanation of plaintiff's estimate of the length of time that it would require to "consummate the deal." Any one who has ever drawn a license agreement for the production of motion pictures, or for the publication of a copyrighted book or the production of a play, must realize that, when the parties have merely reached an agreement as to price and territory, they are still miles apart on innumerable vital stipulations and covenants, failure to agree upon any one of which ends the negotiation. I am reluctantly brought to the conclusion that there was here no binding contract, because vitally important matters necessarily connected with it on account of the very nature of the subject-matter of the contract were all left open to future agreement. Not only are the terms set forth in the telegrams incomplete, but they are indefinite and uncertain. Does the plaintiff become the owner of the prints free from any restriction? Can he sell and dispose of them as he sees fit? If they are destroyed, upon whom does the loss fall? Can the plaintiff reproduce the prints and sell them indiscriminately? These are some questions which the telegrams leave open and undecided, the importance of which is obvious. If the telegrams constitute a contract, then important and necessary terms are left undefined and ambiguous. As Mr. Justice Miller said in Racich Asbestos Co. v. Brooks, 146 App. Div. 14, 130 N. Y. Supp. 382:

"It is an elementary rule that a court of equity will not enjoin specific performance of an agreement unless it is definite and certain in its terms."

Furthermore, a contract which cannot be specifically enforced against one party will not be specifically enforced against the other. Wadick v. Mace, 191 N. Y. 1, 83 N. E. 571. It is to be observed that the plaintiff has signed nothing whatever except the telegram announcing his intention of coming to New York to consummate the deal. Assuming, however, that he actually made the offer which one officer of the defendant corporation communicated to another, plaintiff has bound himself to nothing except to pay a stipulated sum of money. If the telegrams constitute a complete contract, the defendant corporation has no protection at all against plaintiff taking the prints which he receives into any other territory and interfering with defendant itself, or with other customers of defendant. Plaintiff has bound himself to none of the stipulations that are usual and customary in such contracts. For lack of mutuality of the remedy, therefore, the motion would have to be denied.

[3, 4] Finally, even if there were a contract between the parties, it could not be specifically enforced, because the defendant corporation has already disposed of the Portland rights, which were part of the subject-matter of the alleged contract. It is, of course, apparent that an injunction would be tantamount to a decree for specific performance, where the injunction would affect the rights of producing this picture of great vogue in as many as 17 states. Equity will not decree specific performance where, because of then existing facts, the decree cannot be complied with. Pomeroy, Spec. Perf. Contr. (2d Ed.) §§ 292, 293; Beattie v. Burt, 122 App. Div. 473, 107 N. Y. Supp. 153; Rosenberg v. Haggerty, 189 N. Y. 481, 82 N. E. 503; Kennedy v. Hazelton, 128 U. S. 667, 9 Sup. Ct. 202, 32 L. Ed. 576.

For these reasons the motion for an injunction pendente lite must be denied, and the temporary injunction dissolved, but without costs.

Ordered accordingly.